**UNITED STATES of America**

v.

**Tracey A. HALL, Appellant**

**No. 91–3191.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1992.

Decided July 10, 1992.

---

John A. Briley, Jr., Washington, D.C. (appointed by the Court), for appellant.

Thomas R. Eldridge, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas J. Tourish, Jr., and Wendy L. Wysong, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Tracey A. Hall was indicted on one count of possession with intent to distribute 50 grams or more of cocaine base (crack) in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(iii) (1988). Claiming that her

rights under the Fourth Amendment were violated because she did not "voluntarily" consent to the search that led to the discovery of the cocaine, appellant moved to suppress the drugs seized at the time of her arrest. The district court denied that motion and appellant, after a half-day bench trial, was convicted of the offense charged.[1] Appellant challenges her conviction, arguing that the district erred in denying her motion to suppress and that there was insufficient evidence to support her conviction. We reject both challenges and affirm the judgment below.

## I. BACKGROUND

At the hearing on appellant's motion to suppress, Officer Ronnie Hairston of the Washington, D.C. Metropolitan Police Department gave the following testimony. In the early morning hours of December 7, 1990, Officer Hairston and other police officers from the Department's Narcotics Intervention Unit were on duty at the Greyhound Bus Terminal in Northeast Washington, D.C. At approximately 3:40 a.m., Officer Hairston saw appellant get off of a bus from New York City, walk through the terminal and exit the station into the terminal parking lot on L Street, N.E. Officer Hairston, dressed in casual clothes and with his weapon concealed, approached appellant and, speaking in a normal, conversational tone, identified himself as a police officer, showed her his identification folder, and asked if he could speak with her. Appellant said "yes."

Officer Hairston then asked to see appellant's bus ticket. Appellant replied that she had left the ticket on the bus. He also asked appellant whether the purple tote bag she was carrying belonged to her. Appellant stated that it did. Officer Hairston explained that he was searching for drugs carried by passengers travelling to Washington, D.C. and asked whether she understood the purpose of the interview. Appellant stated that she did. Officer Hairston then asked if she had any drugs in her bag

or on her person. Appellant responded that she did not, and Officer Hairston asked if he could search her person and the tote bag. Officer Hairston testified that appellant gave him permission to search her person and the tote bag and set the bag down on the trunk of a nearby police cruiser. In a side compartment of the tote bag, Officer Hairston discovered a package wrapped in brown tape, and, upon opening the package, found crack cocaine. In that same compartment, Officer Hairston found appellant's bus ticket.

Appellant's testimony largely corroborated Officer Hairston's version of events, with one notable exception. According to appellant, Officer Hairston never asked for permission to search the tote bag, but instead seized the bag and started searching it immediately after she denied possession of any illegal drugs.

Appellant also testified as to the events that followed Officer Hairston's discovery of the cocaine. According to her account, an officer handcuffed her and placed her in a police car and then, while she was waiting in the car, read her her *Miranda* rights. On arriving at the police station, appellant was asked to fill out a waiver of rights card. She initially answered "yes" to Question 4 on the card. Though the record does not indicate the precise nature of that question, it apparently relates to whether the detainee wishes to waive the right to counsel or the right to remain silent. Her answer ("yes") indicated to the officer present that she was willing to answer his questions. When the officer started to question her, however, she refused to answer any questions and requested a lawyer. The officer then explained that she should have written "no" not "yes" in response to Question 4, after which Hall made that change on the waiver of rights form.

Appellant's testimony, and that of Dr. Allan Vaughn, an expert called to testify on her behalf,[2] revealed certain atypical

**1.** Appellant was sentenced to 121 months imprisonment, to be followed by a five-year period of supervised release, and a $50 special assessment.

**2.** Dr. Vaughn, a clinical psychologist, was called

information about appellant's background and personal characteristics. Appellant, who was eighteen years old on the night of her arrest, has a full-scale intelligence quotient ("IQ") of 76, which, according to Dr. Vaughn, "places her in the borderline range between low-average and mild retardation." Transcript of Motions Hearing (Aug. 7, 1991) ("Tr. I") at 74. Dr. Vaughn conceded, however, that appellant was not retarded,[3] that she could function in society, and that she could understand certain "outside influences." *Id.* at 79.

Appellant testified that she finished the ninth grade, but then dropped out of school when she became pregnant. From the fourth through the ninth grades she participated in special education programs, primarily, she testified, because of her difficulty in reading. Indeed, Dr. Vaughn testified that appellant's grade level score for reading is 2.1 or the age equivalent of a seven year old child, and that her written language skills are on the third grade level or the age equivalent of an eight year old child. During her years in special education, appellant also received counseling for certain psychological problems, though she was reluctant to specify the nature of those problems. Dr. Vaughn testified that Hall appeared to have a "rather serious depression" and a "questionable borderline personality organization" (which we take to mean a "borderline personalty disorder"). *Id.* at 74.

When asked his opinion as to the "voluntariness" of appellant's consent to the search of her tote bag, Dr. Vaughn stated that in his view,

> her cognitive intellectual functioning and her particular personality organization precluded a voluntary consent to search without some explicit statement and perhaps restatement of her right to refuse search; that because of her limited intellectual functioning, the anxiety and the fear of the authority presented by the

police officer didn't even allow her to even question whether or not she had a right to remove herself from that set of circumstances.

*Id.* at 75. Dr. Vaughn did admit, however, that he had not reviewed the specifics of appellant's encounter with the police with either appellant or appellant's counsel, and that appellant never told him that she was in fact frightened when Officer Hairston approached her.

Based on the foregoing testimony, the district court denied appellant's motion to suppress. The court first credited Officer Hairston's testimony that appellant did in fact consent to the search of the tote bag. The court then went on to consider whether that consent was freely and voluntarily given. The court found that it was:

> As to the specific question of whether the defendant freely and voluntarily consented to this [search], I find that she did. I find that she has the ability to make that decision and that she did, in fact, make it.

*Id.* at 104. The court noted Dr. Vaughn's testimony as to appellant's low IQ, but said that appellant appeared to him "to be a properly functioning member of society," and cited the doctor's concession that she was not mentally retarded. *Id.* Recognizing that appellant's initial mistake involving the waiver of rights card had "probative value both ways," the court ultimately concluded that it

> indicates more likely that she had some general understanding of her legal rights. She had enough to know that she needed a lawyer when it reached that stage and I think she had enough to know that she was free to go if she asked the police officer if she could leave.

*Id.* at 105.[4]

After a half-day bench trial, appellant was convicted of possession with intent to

---

as an expert on the question of whether appellant "voluntarily" consented to the search of her bag.

**3.** Dr. Vaughn testified that her IQ is six points higher than the upper range of mild retardation. Tr. I at 74.

**4.** As to the fact that Officer Hairston did not advise appellant that she had a right to refuse

distribute 50 grams or more of cocaine base. On appeal, appellant argues that the district court erred in denying appellant's motion to suppress the cocaine and that there is insufficient evidence to support her conviction. We reject both challenges.

## II. ANALYSIS

### A. *Appellant's Claim of Involuntary Consent*

Appellant does not challenge the district court's finding that she consented to the search of her bag. Her sole challenge to the district court's denial of her motion to suppress is that her consent was not freely and voluntarily given.

■ The general contours of applicable Fourth Amendment law on consensual searches are well established. "[A] search conducted without a warrant issued upon probable cause is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One such exception is a search conducted pursuant to consent. *Id.* However, where the government seeks to rely upon consent to justify a warrantless search, it must prove that the consent was given "voluntarily." *Id.* 412 U.S. at 222, 93 S.Ct. at 2045.

There is no talismanic definition of "voluntariness" readily applicable to the myriad situations in which the police find it efficient to ask permission to conduct a consensual search. *Id.* at 224, 93 S.Ct. at 2046. In each case, the reviewing court must make a factual determination as to whether the consent given was "'the product of an essentially free and unconstrained choice,'" *id.* at 225, 93 S.Ct. at 2047 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (Opinion of Frankfurter, J.)), or, alternatively, whether the defendant's "'will [was] overborne and his capacity for self-determination critically impaired,'" so as to render his consent not truly voluntary. *Id.*

■ In its focus on the "self-determination" and "will" of the accused, the voluntariness inquiry turns not on whether a "reasonable" person in the defendant's position would have felt compelled to consent to a police officer's request to search, but, rather, on whether the *accused herself* actually felt compelled to consent. *See, e.g., United States v. Lewis,* 921 F.2d 1294, 1301 (D.C.Cir.1990) (district court judge erred in basing ruling on voluntariness of consent on "his perception of how bus passengers would generally respond" to police questioning; court must consider why "this particular defendant ... felt compelled to comply with the officer's request").[5] In evaluating the "totality of circumstances" surrounding the accused's consent to search, account must thus be taken of the nature of the police activity towards the defendant "as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2049; *see also United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (recognizing that objectively noncoercive interrogation in airport terminal may have appeared coercive to twenty-two year old black woman who had not graduated from high school; ultimately concluding that "totality

---

consent, the judge stated:

> I don't think the police have any legal requirement to advise any person of their rights not to consent to a search and I've so held in prior cases. Until the Supreme Court tells me there's a Fourth Amendment warning like the Fifth Amendment *Miranda* warning, I'm not going to apply it in my case law.
>
> Tr. I at 104.

**5.** In contrast, the inquiry as to whether an individual has been "seized" within the meaning of the Fourth Amendment focuses on whether "a *reasonable person* would feel free to disregard the police and go about his business." *Florida v. Bostick,* — U.S. —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (internal quotation omitted) (emphasis supplied). "This test enables a court to assess the coercive effect of police action, and its objective standard allows police to determine whether the conduct they are contemplating will implicate the Fourth Amendment." *United States v. Lloyd,* 868 F.2d 447, 450 (D.C.Cir.1989).

of the evidence" supported district court's finding that consent was voluntary); *United States v. Lloyd*, 868 F.2d 447, 451–52 (D.C.Cir.1989) (recognizing that defendant's youth and poor education were relevant factors to be considered; ultimately concluding that totality of the evidence supported district court's finding that defendant's consent to train station drug interdiction search was voluntarily given). This circuit's "test" for assessing the voluntariness of a consent to search reflects this dual aspect of our inquiry:

> To determine whether consent is voluntary, a court must apply a "totality of the surrounding circumstances" test, considering factors such as the accused's age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment.

*United States v. Lloyd*, 868 F.2d at 451 (citing *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047). Because voluntariness is a question of fact, however, we will reverse only if we find that the district court's conclusion was clearly erroneous. *United States v. Battista*, 876 F.2d 201, 207 (D.C.Cir.1989).

■ Against the backdrop of these general premises guiding our review, appellant argues that evidence of her low intelligence, poor schooling, history of psychological problems, and the absence of any warning of her right to withhold consent made it impossible for the government to sustain its burden that she voluntarily consented to the search; she argues that she "merely submitted to a show of police authority." Brief of Appellant at 7. In addressing her claim, we are mindful of the Supreme Court's admonition that where the police have elicited a consent to search under these circumstances—where the subject is of low intelligence or minimal schooling and has not been informed of her right to refuse consent—the reviewing court must "carefully scrutinize[ ]" the record to ensure that that consent was in fact voluntarily given. *Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058.

We now proceed to assess the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation," *id.* at 226, 93 S.Ct. at 2047, to determine whether appellant's consent was in fact voluntarily given.

We turn first to the conduct of the police officer towards appellant. There is inevitably some pressure or apprehension on the part of an individual whenever the police approach and begin asking questions. The government conceded as much in its argument below. *See* Tr. I at 93. Moreover, that pressure and apprehension is bound to be heightened when the questioning occurs in the middle of the night in a relatively deserted parking lot. Nonetheless, given these unavoidable circumstances, the level of pressure applied to this appellant was minimal. Officer Hairston was dressed in plain clothes, his weapon was concealed, and he spoke in a conversational tone of voice. He approached appellant alone and the total length of the encounter, from his first words until the search of her bag, was only "a couple of minutes." *Id.* at 11–12. At most, Officer Hairston asked a half dozen questions. No threats or force were used.

So much for the objective factors in the assessment, factors which come down well on the side of voluntariness of consent rendered under these circumstances. What makes this a closer question is appellant's argument that her subjective frame of mind and atypical mental state rendered her peculiarly vulnerable or fearful of authority figures like the police so that she was not, under these circumstances, truly capable of making a free choice to consent to the search. As noted, Dr. Vaughn testified that a person of appellant's mental IQ, minimal education, and psychological problems, when confronted with police interrogation of this nature would not have understood that she was not obligated to consent to the search of her bag. His testimony obviously raises a question as to whether the consent she gave to Officer Hairston was the product not of an " 'essentially free and unconstrained choice,' " *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047

(quoting *Culombe v. Connecticut*, 367 U.S. at 602, 81 S.Ct. at 1879), but, rather, of her peculiar susceptibility to the police initiative of stopping and questioning her. In this regard, we note that appellant would appear to be making the same argument advanced by the defendants in both *Mendenhall* and *Lloyd, supra.*[6]

▮▮▮ Ultimately, however, we are not persuaded that Dr. Vaughn's testimony carries the day and, like the courts in *Lloyd* and *Mendenhall,* we conclude that the record supports the district court's finding that appellant's consent was in fact voluntary. Apart from the objective factors already discussed, *i.e.,* the police officer's nonthreatening behavior, which militate towards a noncoercive encounter, there is affirmative evidence in the record that appellant, notwithstanding Dr. Vaughn's opinion, did indeed demonstrate a capacity to make autonomous decisions in the face of police questioning. Appellant did not docilely submit to police authority in answering *all* of Officer Hairston's questions. She apparently lied as to the location of her bus ticket, presumably to avoid opening her tote bag where the drugs were hidden. *See* Transcript of Bench Trial (April 4, 1991) ("Tr. II") at 36 (district court attributing evasive motive for her statement that she left her ticket on the bus). That evasive maneuver hardly fits the profile of a subject so overborne by the mere police presence that she lacked all ability to make voluntary choices. Furthermore, following arrest, appellant, after an initial false start in signing the wrong box on the waiver of rights form, eventually refused to answer questions and requested to see an attorney, suggesting that she knew something of her legal rights and that she had the capacity to resist police questioning when she chose to do so.[7]

6. In considering appellant's subjective characteristics as part of our analysis, we are not unmindful of the Supreme Court's ruling in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), that "coercive police activity is a necessary predicate to the finding that a *confession* is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. at 522 (emphasis supplied). If police coercion or, as the *Connelly* Court phrased it, "overreaching," *id.* at 164, 107 S.Ct. at 2049, is also a necessary predicate to the finding that a *consent to search* is not voluntary, then the subject's particular "vulnerable subjective state," *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2049, would be relevant only insofar as the police knowingly took advantage of that vulnerability in eliciting a consent to search. *Connelly's* reasoning has, however, not yet been generally applied to consensual searches. Our search of the post-*Connelly* federal cases reveals only one unpublished circuit court opinion, *United States v. Quezada,* 944 F.2d 903 (4th Cir.1991) and one district court opinion, *United States v. Buchanan,* 773 F.Supp. 1207, 1215–16 (W.D.Wis.1989), *aff'd,* 910 F.2d 1571 (7th Cir.1990), that have applied *Connelly* in the context of a consent search, while other courts have not so extended *Connelly. See, e.g., Tukes v. Dugger,* 911 F.2d 508, 517 n. 13 (11th Cir.1990) ("we do not understand *Colorado v. Connelly* to overturn existing fourth amendment jurisprudence"). *See generally* 3 WAYNE R. LA-FAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §§ 8.1(b), 8.2(e) at 156–60, 197–200 (2d ed. 1987); *id.* § 8.2(e) at 44–45 (Supp.1992).

In any event, we need not resolve this question in this case. Because we agree with the district court's conclusion that appellant did in fact have the ability to voluntarily consent to the search of her bag, this case does not present the question of whether subjective vulnerability in and of itself could ever render a consent given under these circumstances involuntary regardless of the absence of police "overreaching." Along those lines, we note that the government does not ask us to abandon the traditional "totality of the circumstances" test articulated in *Schneckloth, supra,* and followed in *Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879, and our previous interdiction cases, *see, e.g., United States v. Lloyd,* 868 F.2d at 451, nor was the impact of *Connelly* on consent searches even briefed or argued.

7. It is unclear from the district judge's comments regarding Officer Hairston's failure to inform appellant of her right to withhold consent to the search, *see supra* note 4, whether he felt constrained from considering that fact at all as part of the "totality of the surrounding circumstances" or, alternatively, simply believed that the lack of such a warning is not probative on the question of voluntariness. The law is clear that while the police are not *required* to give such a warning before conducting a consensual search, the failure to give such a warning *is* one of the factors relevant to the voluntariness inquiry. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *see also Tukes v. Dugger,* 911 F.2d 508, 517–18 (11th Cir.1990) (noting that police need not inform accused of right to refuse consent, but failure to do so is one factor tending to show consent was not voluntary; ultimately concluding that, on balance, evidence supported finding that consent was voluntary),

In sum, this is a case where deference to the district court's factfinding is controlling. The district court heard the testimony presented, observed the demeanor of the witnesses—including both appellant and Dr. Vaughn—and, ultimately, made a determination that her consent was voluntary. On this record, we cannot say that the district court's determination of voluntary consent was clearly erroneous. We therefore affirm its denial of appellant's motion to suppress.

## B. *Appellant's Claim of Insufficient Evidence*

▮ At trial, the government called Metropolitan Police Sergeant Johnny St. Valentine Brown as an expert on the use and distribution of narcotics and, in particular, on the question of whether appellant had the requisite intent to support a conviction of possession with intent to distribute. Appellant objected to the admission of such expert testimony on the grounds that while expert testimony might be helpful for a lay jury, it certainly was not warranted in a bench trial before a judge who has considerable expertise in the area of narcotics and narcotics trafficking. The district court overruled the objection and admitted

Sergeant Brown's testimony. Appellant now renews that objection,[8] arguing that Sergeant Brown's testimony is the only record evidence supporting the district court's finding that appellant possessed an intent to distribute the cocaine found in her tote bag, and that stripped of that allegedly improper testimony the trial record contains insufficient evidence to support appellant's conviction for possession with intent to distribute.

▮ Appellant's argument does not withstand scrutiny. The "overriding limitation on expert testimony is the requirement that '[u]nder Rules 701 and 702 [of the Federal Rules Evidence], opinions must be helpful to the trier of fact.'" *United States v. Theodoropoulos*, 866 F.2d 587, 591 (3d Cir. 1989) (quoting Advisory Committee Notes to Rule 704 of the Federal Rules of Evidence).[9] Of course, testimony that may be "helpful" for purposes of Rule 702 nonetheless may be unduly prejudicial under Rule 403 of the Federal Rules of Evidence and should therefore be excluded. *United States v. Anderson*, 851 F.2d 384, 393–94 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989).[10] A

*cert. denied, Singletary v. Tukes,* —— U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991); *United States v. Jones,* 846 F.2d 358, 360–61 (6th Cir. 1988) (reversing district court's finding that consent was voluntary where police had not apprised defendant of right to refuse consent, defendant had no formal education, and circumstances of stop and interrogation established coercive atmosphere); *United States v. Chemaly,* 741 F.2d 1346, 1352–53 (11th Cir.1984) (overturning district court's finding that consent was voluntary where, *inter alia,* officer failed to inform defendant of right to refuse consent).

**8.** Appellant objected to the admission of this expert testimony as part of the government's case-in-chief. After the court overruled that objection, however, its expert witness failed to show up for trial. Appellant in turn did not offer any new testimony in her defense at trial. Instead, she moved that the court consider Dr. Vaughn's suppression hearing testimony on voluntariness as probative on the question of whether appellant had the capacity to form an intent to distribute. The defense then rested. However, in the few minutes occupied by the defense motion (the defense case takes up *one page* in the trial transcript), the government was able to procure an expert witness to take the

stand. Sergeant Brown's testimony was thus received into evidence as part of the government's rebuttal case. Tr. II at 23.

The government now argues, weakly we think, that because appellant did not object a second time to the admission of Sergeant Brown's testimony—an objection that was flatly rejected by the district court *only moments earlier*—she waived her right to challenge the admission of that testimony in this appeal. Though we reject the substance of appellant's objection, *see infra,* we also reject the government's waiver argument.

**9.** Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**10.** Rule 403 of the Federal Rules of Evidence provides:

Although relevant, evidence may be excluded if its probative value is substantially out-

trial court has "broad discretion" in deciding both issues, *id.* at 394, and its decision to admit or exclude expert testimony will be sustained unless the court has in fact abused that discretion. *United States v. Baskin,* 886 F.2d 383, 388 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

The district court acted well within its discretion in admitting Sergeant Brown's testimony. The district court was the sole factfinder in this case and thus particularly well-suited to make the determination as to whether expert testimony would be "helpful" on the question of appellant's intent. In any event, appellant's argument proves too much. The perceived danger of indiscriminate admission of expert testimony is that "because of its aura of special reliability and trust" it can unduly bias the factfinder. *Anderson,* 851 F.2d at 393 (internal quotation omitted). But if, as appellant asserts, the court was already an "expert" on narcotics trafficking, then it is highly unlikely that it would have been swayed by the "aura" of the expert's testimony. We thus find no error in the district court's decision to permit expert testimony on the question of appellant's intent and therefore reject appellant's claim that there was insufficient evidence to support her conviction.[11]

### III. CONCLUSION

For reasons given, the judgment of the district court is affirmed.

*It is so ordered.*

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

11. It is unclear from appellant's brief whether, in addition to objecting to the admission of *any* expert testimony on the question of intent, appellant also objects to the particular testimony offered by Sergeant Brown. We assume that she does and therefore have reviewed in full Sergeant Brown's trial testimony. We find no error. At no point did Sergeant Brown's testimony cross the line drawn by Rule 704(b) of the *Federal Rules of Evidence that separates analysis* of those facts suggestive of a particular state of mind from ultimate issue testimony as to the appellant's actual state of mind. *See generally United States v. Dunn,* 846 F.2d 761 (D.C.Cir. 1988).