**UNITED STATES of America,**

v.

**Manuel AGOSTINI, Defendant.**

**Crim. No. 92–0290–LFO.**

United States District Court,
District of Columbia.

April 6, 1993.

Abby Stavitsky, Asst. U.S. Atty., Washington, DC, for U.S.

Santha Sonenberg, Asst. Fed. Public Defender, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

This matter is before the Court on the defendant's motions to suppress tangible evidence and statements. Hearings on the motions were held on November 3, 1992 and April 1, 1993, and argument was heard on April 5, 1993. On the basis of the findings detailed below, defendant's motions will be denied.

### I. FACTS

The events leading up to the arrest of the defendant occurred on July 7, 1992. Detective Ronnie Hairston of the District of Columbia Metropolitan Police Department testified that on that date he was "working interdiction" with another detective at the Greyhound bus station located in the 100 block of L Street, N.E., Washington. Tr. I at 5.[1] At approximately 6:18 p.m., Hairston observed Mr. Agostini get off a Greyhound bus that had arrived from New York City, walk through the bus station, and exit the station onto L Street. Mr. Agostini, who was carrying a gray tote bag, then walked along the sidewalk on L Street. Detective Hairston approached the defendant and touched him on the shoulder. According to Detective Hairston's testimony, Hairston asked Mr. Agostini if he could talk to him, and Agostini said "yes." Detective Hairston next (again, according to his own testimony) asked the defendant if he could speak English, and Mr. Agostini responded "yes." On cross-examination, Detective Hairston was asked if he knew that Mr. Agostini was Hispanic, and responded: "I heard Mr. Agostini speak in Spanish, so when I first approached him, I asked him if he spoke English." Id. at 16–17.

Next, Hairston asked the defendant if he could see his bus ticket. Mr. Agostini responded by giving Hairston the ticket. Detective Hairston looked at the ticket and gave it back to Mr. Agostini. Detective Hairston then asked the defendant where he was going. Mr. Agostini responded, according to Hairston, "16th and Park Road." Id. at 7. Then Hairston asked the defendant if the gray tote bag he was carrying belonged to him, and Mr. Agostini said "yes." Detective Hairston then explained why he was talking to the defendant, stating: "that I worked at the bus station, and we had a problem with drugs coming into the District of Columbia from New York ... and [that] I talked to passengers, and I asked the passengers for permission to search their luggage and their person for drugs and weapons, and then I asked him if he understood." Id. at 20. Mr. Agostini responded in the affirmative, according to Hairston. Id. at 8. Next, Detective Hairston asked the defendant if he was carrying any drugs. Mr. Agostini said "no." Id.

Detective Hairston testified that he then asked Mr. Agostini if he could search his

---

1. "Tr. I" refers to the transcript of the November 3, 1992 hearing; "Tr. II" refers to the transcript of the April 1, 1993 hearing.

person and the tote bag, and that Mr. Agostini answered "yes." *Id.* at 9. Then, according to Hairston:

> Mr. Agostini handed me the tote bag. I placed the tote bag on the sidewalk, and I started to search the bag. Mr. Agostini had his bus ticket, he had balled it up in his hand, he told me he was going to put his bus ticket in the trash can. I told him okay, and I continued to search the bag. As I was searching the bag, Mr. Agostini started to run.

*Id.* at 9–10. Detective Hairston testified that he was "already into" the bag at the point when the defendant began running.[2] *Id.* at 10, 15. Detective Hairston ran after the defendant, caught him, and placed him under arrest after reading him his rights. At that point, Hairston testified, Mr. Agostini stated that he was carrying the drugs for his cousin.

Detective Hairston never advised Mr. Agostini that he had the right to decline consent to a search of the tote bag. Hairston did not take any notes or recordings at the scene of the encounter with the defendant. *Id.* at 13.

Mr. Agostini testified through an interpreter. His testimony as to the events that transpired on July 7, 1992 was largely consistent with that of Detective Hairston. However, he explained that he understood few of the words spoken by Hairston. For example, Mr. Agostini understood from the word "English" that he was being asked whether he spoke English, and responded "yes" because he did not know how to say that he spoke only "certain words in English." Tr. II at 5. He also understood some of the words spoken by Hairston that are similar to their Spanish equivalents, such as "ticket," "police," and "drug." *Id.* at 4–6. He testified that he did not, however, understand the complete sentences spoken by Hairston. Mr. Agostini did not initially understand the detective's references to the tote bag. When Detective Hairston began pointing to the bag, Mr. Agostini "felt as though he was giving me an order" and therefore gave him the bag. *Id.* at 6. He testified: "That's why I handed it to him because in Puerto Rico that is the way the law works. When the policeman stops you, he doesn't ask you for permission. He opens the bag." *Id.* Mr. Agostini stated three times that he understood Detective Hairston's reference to the bag to be an "order." *Id.* at 6, 7, 8. On cross-examination, however, when asked to relate the instances in which he received and obeyed "orders" from police officers in Puerto Rico, the defendant identified only routine traffic stops.

The only explanation given by Mr. Agostini of his running from Detective Hairston was the following: "What I did was to run with the ticket in my hand. And I stopped and sat down and waited for him. He did not catch me running." *Id.* at 22. On cross-examination, Mr. Agostini was asked how long he had been in the United States, to which he responded, "It's going to be five years." *Id.* at 11. He further testified that he had worked at various jobs while in the mainland United States, including painting buildings, working on a delivery truck, and working as an assistant to an automobile mechanic. *Id.* at 11–12, 15. Mr. Agostini also testified that he had never had a driver's license. *Id.* at 12.

Mr. Agostini referred at several points to his drinking problem. *Id.* at 4, 18, 22. He testified that he was drunk when he was questioned and arrested by Detective Hairston. An empty bottle of rum was found in the gray tote bag that the defendant was carrying. Tr. I at 25. In addition, defense counsel represented that the defendant had lost some of his front teeth during past drinking binges, apparently as a result of accidents.

Two other witnesses testified for the defense regarding the defendant's limited ca-

---

**2.** It appears, however, that Hairston did not find the drugs in the tote bag until after Mr. Agostini had begun running, as may be reasonably inferred from the following exchange during the government's direct examination:

> Q. And what—well, did you find anything inside the bag?
> A. Yes, sir.
> Q. What did you find?
> A. A plastic bag with white powder in it, sir.
> Q. And had you already noticed the defendant was running at this point?
> A. Yes, sir.
> Tr. I at 10.

pacity to understand English. Assistant Public Defender Beth Brinkmann met with the defendant on July 8, 1992. After she began asking him questions, she "realized he didn't understand me, he could not answer my questions.... He just gave me a blank stare." *Id.* at 29. Janice Bergin, of the District of Columbia Pretrial Services Agency, met with Mr. Agostini on July 16, 1992. She testified that there was a "language problem" with Mr. Agostini, and that she therefore used an interpreter. *Id.* at 37.

Finally, Detective Jesus C. Gonzales of the Metropolitan Police Department testified for the United States. Detective Gonzales testified that on July 7, 1992, between 6:50 and 7:00 p.m., Detective Hairston approached him at the narcotic and special investigation division headquarters and asked him to read Mr. Agostini his rights in the holding cell. The reason that Hairston gave to Gonzales for this request was that the defendant was "of Spanish background," and Gonzales is fluent in Spanish. Tr. II at 27, 36. Detective Gonzales testified that he introduced himself and advised the defendant of his rights in English, reading from his own personal "PD–47" form. *Id.* at 27. Gonzales then went to retrieve another PD–47 form for the defendant to sign. He testified that he was unable to find a PD–47 written in English after searching in two locations at the station. *Id.* at 29. Detective Gonzales then gave the defendant a Spanish-language PD–47 form, which Mr. Agostini read and signed.

## II. CONCLUSIONS

■ The defendant first argues that his interrogation constituted an illegal "seizure" in violation of the Fourth Amendment. Whether an individual has been "seized" for purposes of the Fourth Amendment turns on whether "a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). The inquiry is thus an objective one. The objective circumstances here do not justify the finding of a seizure. Mr. Agostini was approached by a single officer on a sidewalk and in daylight. The officer did not display any weapons, but simply asked if he could speak to the defendant. There is no evidence of coercive gestures or speech on the part of the officer. As found in cases such as *Bostick, United States v. Maragh*, 894 F.2d 415 (D.C.Cir.1990), *United States v. Baskin*, 886 F.2d 383 (D.C.Cir.1989), and *United States v. Lloyd*, 868 F.2d 447 (D.C.Cir.1989), the objective situation presented here does not establish a seizure.

■ Second, defendant contends that his statement was obtained unlawfully. This argument must also be rejected. The unrefuted evidence showed that Mr. Agostini's spontaneous statement to Detective Hairston was not made during a "custodial interrogation" or its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301, 303, 100 S.Ct. 1682, 1689–90, 1690–91, 64 L.Ed.2d 297 (1980). Moreover, the defendant had been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when he made the statement. Nor has defendant provided any basis for concluding that the statement was made involuntarily. The statement was volunteered by Mr. Agostini without any threats, promises, or other coercion on the part of Detective Hairston. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986).

■ Defendant's final argument is the most difficult. He contends that he did not freely and voluntarily consent to the search of his tote bag. Unlike the issue of whether a "seizure" occurred, the matter of voluntary consent *vel non* turns on a subjective inquiry, namely, whether the defendant himself actually consented to a search and did so voluntarily. *United States v. Hall*, 969 F.2d 1102, 1106 & n. 5 (D.C.Cir.1992).

When the defendant handed his bag to Detective Hairston there was implicit consent to search it. There could be no other reason for Hairston to ask for it, or for the defendant to hand it over.

However, the government has the burden of proving by a preponderance of the evidence that consent was voluntary in the sense that it was "free from any aspect of official coercion." *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 229, 93 S.Ct. 2041, 2048–49, 36 L.Ed.2d 854 (1973). *Bustamonte* thus imposes upon the government the burden of assuring the absence of coercion. In addition, the government must show that *this defendant,* not some hypothetical reasonable person, voluntarily consented. *Hall,* 969 F.2d at 1106.

Here the government has proved the absence of most of the indicia of coercion cited in other cases. There was only one interviewer and no threatening back-ups in view. *Compare United States v. Maragh,* 756 F.Supp. 18, 23 (D.D.C.1991). There is no evidence of any weapons display, or threatening language or tone. The questioning occurred on a sidewalk during daylight hours. The freedom of movement afforded Mr. Agostini by the interviewer is evidenced by his initial acquiescence in Agostini's going to the trash can to throw away his ticket. While Detective Hairston did not warn the defendant of his right to refuse the search, the cases require no such warning as a predicate to an otherwise valid consent to a search.

Mr. Agostini claims that, because he did not understand Hairston's English, and because in Puerto Rico he was accustomed to obeying police orders, he mistook Hairston's request for an "order." [3] The limits to Agostini's understanding of English do not alter the government's demonstration that there was no coercion. Moreover, his claim that the police in Puerto Rico had taught him to obey their orders did not survive cross-examination. When pressed, traffic stops were the only Puerto Rican police "orders" that he could recall. Indeed, it is judicially noticeable that Puerto Rico is not a Latin American dictatorship, and Puerto Rican police tactics are governed by the same Fourth Amendment that obtains in the District of Columbia. Defendant's "poetic license" in describing his prior experience with the police confirms this fact-finder's impression, gained from observation of Mr. Agostini's demeanor and manner of response as well as the fact that he has lived, worked, shopped, and traveled for five years on the United States mainland, that Agostini can speak and understand English much better than he appeared to do in Court or in the presence of the defense witnesses who testified on his behalf.[4]

Weighing together the consent implicit in the handing-over of the bag, the likelihood that Mr. Agostini understood enough English to know that Hairston was requesting, but not ordering, an opportunity to search the bag, along with the government evidence of the absence of coercion, I find that it is more likely than not likely that the defendant freely and voluntarily consented to the search of his bag which revealed the incriminating contraband.

\* \* \* \* \* \*

For the foregoing reasons, it is this 6th day of April, 1993, hereby

ORDERED: that defendant's motions to suppress tangible evidence and statements should be, and are hereby, DENIED.

---

**3.** Mr. Agostini also suggests that the fact that he was intoxicated establishes that consent was not voluntarily given. However, Detectives Hairston and Gonzales testified that there was no evidence that Agostini was intoxicated, and, in any event, the evidence viewed as a whole certainly supports sufficient sobriety and awareness on his part to permit a voluntary consensual decision.

**4.** The defendant also conceded that he answered "yes" when asked by Hairston if he spoke English, and the testimony of Detectives Hairston and Gonzales supports the conclusion that he largely understood what they said to him in English.