**UNITED STATES of America**

v.

**Amrhu A. DYCE, Defendant.**

**Crim. A. No. 93–0219.**

United States District Court, District of Columbia.

Dec. 15, 1993.

Leigh A. Kenny, Federal Public Defender for D.C., Washington, DC, for defendant.

Richard Lee Chamovitz, U.S. Attys. Office, Washington, DC, for U.S.

### MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This matter is before the Court on defendant's Motion to Suppress Tangible Evidence and Statements. The Court held an initial evidentiary hearing on October 20, 1993 at which government witnesses and the defendant, Amrhu Dyce, testified. Because of conflicting testimony at the initial hearing, the Court held a second hearing on November 22, 1993. For the reasons recited below, the motion will be granted in part and denied in part.

### Testimony from October Hearing

On the morning of May 6, 1993, Ms. Dyce arrived at the train station in New York City. At the station, Ms. Dyce purchased a one-way ticket on Amtrak train number 81/91 to Raleigh, North Carolina and paid the $100.00 purchase price in cash. Ms. Dyce purchased her ticket shortly before the train's scheduled departure time of 9:42 a.m. When the train arrived at Union Station in Washington, D.C. later that day, officers with the District of Columbia Metropolitan Police Department ("MPD") Narcotics Interdiction Unit and Amtrak police officers boarded the train planning to interview the defendant.

Investigator Thomas Cook of the Amtrak police testified at the suppression hearing that prior to boarding the train the police had not received a tip that defendant was transporting illegal narcotics or that she was breaking any law. Investigator Cook testified that he made the decision to question Ms. Dyce on the basis of information gleaned from Amtrak's reservation system. Mr. Cook detailed his findings in an arrest report he completed on May 7, 1993 and which was entered into evidence at the suppression hearing as government's exhibit 1.

The May 7, 1993 arrest report refers to similarities Mr. Cook noticed between reservation 95712 in the name of Delores Williams and reservation 95671 in the name of A. Dyce. The reservation for Ms. Williams was made at 11:58 p.m. on May 4, 1993 and showed one way travel to Raleigh, North Carolina in a double slumber coach. The Amtrak reservation system revealed that the Amtrak ticket agent who took the reservation was given a reservation confirmation telephone number of (718) 771–2586. The ticket was picked up on May 6, 1993 at 9:23 a.m. and was paid for in cash in the amount of $205.00.

According to the arrest report, the reservation in the name of A. Dyce was made at 11:53 p.m. on May 4, 1993 and showed one way travel to Raleigh, North Carolina in coach class. The person who made the reservation in Ms. Dyce's name gave a reservation confirmation number of (718) 771–2586. At 9:25 a.m., Ms. Dyce picked up her ticket from the same ticket agent used by Delores Williams and paid for it in cash. In addition to the above similarities, Investigator Cook's observation in the arrest report that defendant and Ms. Williams were travelling from "a source city for narcotics," led him to conclude that they were travelling together and were possibly transporting contraband.

When the train arrived in Washington, D.C., Cook and the other officers boarded the train armed with a description of Ms. Dyce and Ms. Williams provided by the Amtrak ticket agent in New York. Mr. Cook testified that he and Detective Buss of MPD located Ms. Williams in the lounge car, he identified himself to her as a police officer, and asked her to produce some identification. Ms. Williams stated, in response to questions by Mr. Cook, that she was not carrying illegal narcotics. She consented to a search of her person and her luggage and the searches produced no illegal narcotics. Mr. Cook stated in his arrest report that Ms. Williams denied knowing anyone named Dyce and maintained that she was travelling alone. He testified that Ms. Williams did not supply him with any information connecting her to the defendant or connecting the defendant to any illegal drugs.

Investigator Cook testified that following his questioning of Ms. Williams he proceeded to the coach car of the train carrying passengers bound for Raleigh. He stated that he was wearing plain clothes and carrying a gun, but the gun was concealed by his jacket. He approached a woman matching the description of Amrhu Dyce and identified himself as a police officer, showed her his badge

and asked to see her train ticket. According to Mr. Cook, Ms. Dyce stood up to retrieve a tote bag from the overhead luggage rack, removed her ticket from the bag and showed it to him. Cook testified that the defendant agreed to talk to him. He asserts that he asked Ms. Dyce for some identification and she showed him her alien registration card. In response to his questions she responded that she was not travelling with anyone, was employed as a property manager in New York, and would only be in Raleigh for the weekend.

Investigator Cook stated that he explained to Ms. Dyce that trains are often used to transport contraband and asked her if she was carrying explosives, weapons or narcotics. She replied, "No." Cook stated that he asked Ms. Dyce if he could examine her bag and search it. He stated that Ms. Dyce consented to the search but he could not remember the exact words she used. In response to the Court's question, however, Cook stated that she used words to the effect of "yes, go ahead." Mr. Cook denies threatening defendant or coercing her in any way.

Mr. Cook recalls Detective William Buss standing approximately two rows of seats behind Ms. Dyce and that Buss did not say anything to Ms. Dyce. He cannot recall whether Detective Buss, from where he stood, could have overheard what was said between himself and defendant. He stated that prior to the search, no officer spoke to defendant, touched her, or displayed anything identifying them as police officers.

Cook's search of Ms. Dyce's bag produced a brown paper bag wrapped in a white tee shirt. Inside the paper bag he found three plastic bags containing what was later found to be approximately 197 grams of crack cocaine.

Cook testified on cross examination that when he approached Ms. Dyce in the coach car she appeared to be awake and did not seem to be guarding her tote bag. Nor was she acting suspiciously. Cook concedes that he did not inform her of her right to refuse to answer questions, to refuse to submit to searches, and her right to stop answering questions. Neither did he inform her of her right to restrict the scope of the searches.

Officer Maria Pena of the MPD also testified on behalf of the government at the suppression hearing. Officer Pena is a six year veteran of the MPD and has spent one and a half years on its interdiction unit. She testified that after Investigator Cook indicated that he had found illegal narcotics in Ms. Dyce's bag, Dyce was arrested, handcuffed, and escorted off the train. Pena recalls that while on the station platform, Officer Larry Coates orally advised defendant of her Miranda rights and asked her if she understood those rights. Officer Pena stated that defendant replied that she did understand her rights.

In the course of her search of defendant, Pena discovered in defendant's shirt pocket a piece of a train ticket bearing the number and letter corresponding to a car and seat on the train. Detectives recognized it as the location of Ms. Williams' seat, and re-boarded the train. Pena stated that Ms. Dyce then made two voluntary statements to her on the platform. Ms. Dyce first stated, "I should not have told on my girlfriend." Then Ms. Dyce asked Pena "If I say those are my drugs, will you let my girlfriend go?"

On cross examination, Officer Pena stated that she remembered hearing Detective Larry Coates ask Ms. Dyce whether she understood her rights but as she was occupied with other matters at the time she did not hear exactly what he said. Officer Pena never asked Ms. Dyce whether she was waiving those rights nor did she inform Ms. Dyce that she had a right to an attorney. While in transit to the police station, Ms. Dyce is alleged to have made other incriminatory statements.

Officer Pena read Ms. Dyce her rights in the police station and obtained Ms. Dyce's signature on form PD–47, an advice of rights card. On the PD–47, Ms. Dyce indicated that she had been read her rights and understood them, she did not wish to answer any questions and would not answer questions without a lawyer present. The PD–47 is signed by Maria Pena and dated May 6, 1993 but the time it was completed is not recorded.

Ms. Dyce's version of the events of May 6, 1993 differs radically from that of the government's witnesses. Dyce testified that she was sleeping when Cook touched her on the shoulder. She affirms that he asked for her name and she told him. Ms. Dyce testified that he also asked whether the woman sitting next to her was a travel companion and she said that she did not know the woman. Cook asked whether she had any luggage. When she pointed out her tote bag he demanded that she show it to him.

She placed the bag in a seat in the row directly behind her. At that point she noticed that approximately 5 people were "surrounding" her and stood between her and the two exits on either end of the car. She recalls that whenever she moved, the persons around her moved as well. She stated that a tall black man and a green-eyed black woman stood behind her and recalled that the woman had handcuffs on her belt and was wearing latex gloves. The tall black man stepped between herself and her luggage so she could no longer observe her bags. She testified that during the time she could not see her bags, Investigator Cook was asking her questions about explosives and weapons. She also testified that while he was asking her those questions, she could tell from the sounds and his movements that he was searching through her tote bag and pocketbook. She claims that the police officers never responded to her inquiries as to what was going on. She stated that she was never read her rights on the station platform and was told repeatedly that she was "in trouble," was "facing 10 to 20 years," and maybe a life sentence. They asked whether she was travelling with Delores Williams and pointed out that it was not fair that she should have to serve her jail sentence alone. According to Ms. Dyce the police officers told her more than once that they knew about her "friend in the sleeper car." She confirmed that Officer Pena searched her and found a ticket stub with numbers written on it. She testified that Officer Pena declared, "This is the piece to the puzzle!" At that, the officers dashed back onto the train and left defendant alone in handcuffs on the platform.

She denied making any inculpatory statements on the platform including those testified to by Officer Pena. She also adamantly denied knowing Ms. Williams or travelling with her. She stated that she first met Ms. Williams in the train station in New York. She had dropped her windbreaker and Ms. Williams picked it up and handed it to her. Ms. Williams introduced herself as "Lois" and during a brief conversation defendant learned that they were both going to Raleigh, North Carolina. Defendant also claimed that when she made her train reservation, the reservation agent did not ask for a confirmation number.

Defendant added that during the journey from New York she awoke to find "Lois" standing over her. Lois invited her to join her for drinks but defendant declined the invitation. Lois mentioned that if defendant needed to be more comfortable because of her pregnancy, she was free to use "Lois'" sleeper compartment. Defendant again declined so Ms. Williams tore off piece of her ticket and handed it to her in case defendant changed her mind. Defendant maintains that she discovered that Ms. Williams was from Brooklyn only after they were locked up.

### Testimony from November 22, 1993 Hearing

The foregoing substantially different versions of the events of May 6, 1993 were before the Court after the October suppression hearing. The testimony of Ms. Dyce was persuasive enough to create some doubt in the mind of the Court as to what had actually transpired. A key feature of Ms. Dyce's story was her claim that she had never known Ms. Delores Williams—the woman who had purchased the sleeper compartment ticket—prior to the ill-fated train voyage on May 6, 1993. Because Ms. Dyce's initial story had a ring of truth, a second suppression hearing was held on November 22, 1993 to explore further whether Ms. Dyce's claims concerning Ms. Williams were plausible. At the second hearing Officer Cook expounded on the numerous links between Ms. Dyce and Ms. Williams. Ms. Dyce also retook the stand in order to satisfy

this Court as to the soundness of her account.

At the second hearing Officer Cook presented impressive circumstantial evidence that Delores Williams and Amrhu Dyce were acquainted with each other prior to May 6, 1993. The facts are as follows:

1) Amtrak computer records show that a train reservation was made for Dyce/A for travel from NYC Penn Station to Raleigh, N.C., departing May 6 at 9:42 am.

2) Amtrak computer records show that a train reservation was made for Williams/Delores for travel from NYC Penn Station to Raleigh, N.C., departing May 6 at 9:42 am.

3) Dyce's reservation was made on May 4 at 11:53 pm.

4) Williams' reservation was made on May 4 at 11:58 pm—five minutes after the Dyce reservation was made.

5) While these two reservations were made not during the same telephone call, both reservations listed the same call-back number: (718) 771–2586.

6) The telephone call-back number (718) 771–2586 is listed in the New York Telephone records as the number of an Arlene Williams, of Brooklyn, NY. At the time of her arrest, Delores Williams gave police the (718) 771–2586 number as her own phone number and listed Arlene Williams as her sister.

7) Williams picked up her ticket 19 minutes prior to departure.

8) Dyce picked up her ticket 17 minutes prior to departure, from the same ticket agent from whom Williams had received her ticket.

9) While the sleeping compartment assigned to Ms. Williams and the coach seat assigned to Ms. Dyce were separated by several train cars, Dyce had on her person a portion of Williams' ticket listing Williams' compartment number.

10) Ms. Dyce had on her person at the time of arrest a piece of paper with train information and the words "Sundown Inn Capital Blvd" written on it.

11) Delores Williams had in her possession at the time of arrest a business card for the Sundown Inn Motel on Capital Blvd. in Raleigh, North Carolina.

12) Ms. Dyce had made a prior reservation on an Amtrak train to travel to Raleigh on April 1, 1993, although the reservation was never ticketed. The call-back number listed for the April 1 train was (718) 771–2586.

13) There had been a reservation made for a D. Williams on the April 1 train.

After Investigator Cook presented these facts, Ms. Dyce then retook the stand and reasserted that she had never seen or known of Ms. Williams prior to May 6, 1993. Her explanation for the aforementioned series of links between herself and Ms. Williams is as follows:

Ms. Dyce was romantically involved with a man named Everton Griffith, of Jamaica. Mr. Griffith would periodically travel to Raleigh, North Carolina, call Dyce and ask that she visit him in Raleigh. Griffith would make the travel arrangements and call with train reservation and hotel information only a few days before Dyce was expected to travel to North Carolina. Dyce had travelled to the Raleigh area under these circumstances at least four times in 1993 prior to her arrest. The Sundown Inn was one of a number of hotels where she had stayed. Dyce would stay for maybe two days on each visit. Dyce was expected to pay for the train or bus tickets in cash and Griffith would reimburse her once she got to Raleigh.

According to Ms. Dyce, Griffith never asked Dyce to bring anything with her. Ms. Dyce had no knowledge as to why Griffith would use a Brooklyn telephone number as a call-back number. Dyce never asked Griffith what his business was or what he was doing in North Carolina. Dyce testified she had no knowledge of the drugs in her tote-bag. She claimed someone could have put the drugs in her bag while she was asleep.

## ANALYSIS
### Suppression of Tangible Evidence

■ Defendant bases her demand for suppression of the evidence seized from her tote-bag on her assertions that she did not con-

sent to the warrantless search that Investigator Cook conducted. In the alternative, Dyce asks this Court to find that any consent that was given was involuntary, because of the oppressive circumstances that confronted Ms. Dyce as she was surrounded by the police. In cases such as this, the burden is on the government to establish that consent was validly obtained, not in violation of Ms. Dyce's rights. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

■■■ The Court finds that the government has met its burden of proving that the search of Ms. Dyce's tote-bag was conducted pursuant to freely given consent by Ms. Dyce. Investigator Cook did not seize Ms. Dyce within the meaning of the Fourth Amendment until after the discovery of contraband in her tote-bag. Investigator Cook did not violate Ms. Dyce rights simply by asking to see her ticket. *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

The Court finds that the search of the tote-bag was consensual. The officer was dressed in plain clothes, no weapon was displayed, and no threats of force were used. The encounter prior to her consent was relatively brief. All these factors militate towards a finding of voluntariness. *United States v. Hall,* 969 F.2d 1102, 1107 (D.C.Cir. 1992), *cert. denied* —— U.S. ——, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992). Moreover, much of Ms. Dyce's testimony must be discounted because of the implausibility of her explanation for the links between herself and Ms. Williams. Other testimony of Mrs. Dyce is also suspect. It is this Court's finding that Ms. Dyce is not being truthful about a number of the events to which she testified. It is obvious to the Court that Ms. Dyce, an articulate and intelligent young woman, knows something more about Ms. Williams, Mr. Griffith, and the train reservations than she is willing to admit. In maintaining a clearly implausible account of her ignorance of Ms. Williams, Ms. Dyce undercuts the rest of her testimony about the events that transpired on the train prior to her arrest. Because the search of Ms. Dyce's tote-bag was consensual, the motion to suppress evidence taken from that tote-bag will be denied. *See Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (Fourth Amendment permits police officers to make inquiries of passengers on buses and request consent searches of their luggage); *United States v. Caballero,* 936 F.2d 1292, 1296 (D.C.Cir.1991) (consensual bus or train stops do not amount to seizures).

*Suppression of Statements*

■■■ The Court will suppress all statements made by Ms. Dyce between her arrest and her signing of form PD–47, the advice of rights card. The Court does not make this determination on the basis of credibility. Instead, this Court finds that the government has not provided adequate proof on the record that Ms. Dyce adequately understood her *Miranda* rights when Detective Larry Coates orally advised Ms. Dyce of her rights on the train platform. The testimony of Officer Pena is insufficient to carry the government's burden of establishing that Ms. Dyce was informed of her *Miranda* rights, that she understood those rights, and that she waived them voluntarily. Officer Pena testified that she could not hear exactly what was said by Detective Coates because she was occupied with doing other things at the time.

The Supreme Court held twenty-seven years ago that the government must take care to insure that a suspect in a criminal case is made fully aware of her right to remain silent. The Court's admonition in that famous case bears repeating here:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence

of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence of interrogation can be used against him.*

*Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) (emphasis added). The Court finds that Ms. Dyce became fully aware of her right to remain silent only after she read and signed form PD–47. After reading the advice of rights card Ms. Dyce indicated that she did not wish to answer any questions and she was not willing to answer any questions without having an attorney present. Because the Court is not convinced that she fully understood her right to remain silent before reading the advice of rights card, the Court will suppress all statements made by Ms. Dyce between the time of her arrest and her signing of the card.

An appropriate order accompanies this opinion.

### ORDER

Upon consideration of Defendant's Motion to Suppress, the Government's Opposition thereto, and extensive testimony by Police Witnesses and the Defendant, it is hereby

**ORDERED** that the Defendant's Motion to Suppress tangible evidence be denied; and it is further

**ORDERED** that the Government be prohibited from introducing at trial any statements made by Defendant between the time of her arrest and her signing of the PD–47 advice of rights form.