UNITED STATES of America, Appellant,

v.

Amrhu A. DYCE, Appellee.

No. 94–3171.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 29, 1995.

Decided March 8, 1996.

As Amended March 8, 1996* and
July 30, 1996.

Order Denying Suggestion for
Rehearing En Banc July 30, 1996.

---

* The complete text of the panel's opinion as it has been amended by the order of March 8, 1996, and this order follows. It is being reissued at this time for purposes of future citation.

Geoffrey Bestor, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Elizabeth Trosman, P. Kevin Carwile, and Barbara J. Valliere, Assistant United States Attorneys, Washington, DC, were on the briefs, argued the cause, for appellant.

A.J. Kramer, Federal Public Defender, with whom Leigh A. Kenny, Assistant Federal Public Defender, Washington, DC, was on the brief, argued the cause, for appellee.

Before BUCKLEY, GINSBURG, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The United States questions the district court's authority to reduce appellee Amrhu Dyce's sentence below the level established by the United States Sentencing Guidelines on the basis of her "extraordinary" family responsibilities and "the totality of the circumstances." Because we agree with the Government that Dyce's family responsibilities were not exceptional and that the circumstances cited by the district court did not warrant a departure from the sentence mandated by the Guidelines, we vacate the sentence and remand the case for resentencing in accordance with this opinion.

## I. BACKGROUND

Dyce pled guilty to conspiracy to commit the offense of possession with intent to distribute crack cocaine, in violation of 18 U.S.C. § 371 (1994). At the taking of the plea, which was made pursuant to a plea agreement, Dyce described her role in the crime, which was essentially that of a courier or "mule." The presentence report calculated the adjusted offense level at 34. Because Dyce had accepted responsibility, however, her offense level was reduced to 32; and because she had no prior convictions, her criminal history was designated as category I. The Guidelines prescribe an imprisonment range of from 121 to 151 months for individuals having this offense level. The maximum statutory penalty for Dyce's crime, however, is 60 months; as a consequence, the Guidelines reduce the prescribed sentence to five years. See 18 U.S.C. § 371; U.S.S.G. § 5G1.1(a).

Dyce's presentence report indicated that she was an alien and the mother of two young children, and that she was expecting a third. Although unmarried, she and the father of her children lived with her mother, father, and sister, all three of whom claimed to be employed. The author of the presentence report was unable to verify Dyce's own claims of employment during the six years prior to her arrest.

Dyce filed a sentencing memorandum in which she requested that the district court depart downward from the Guidelines sentence. She offered the following grounds for the departure: (1) her family responsibilities were "extraordinary"; (2) the offense was an act of aberrant behavior; (3) the sentence imposed by the Guidelines for a crack cocaine offense has a disproportionately severe effect on black defendants; (4) because she was an alien, she would be subject to more severe prison conditions than would similarly situated U.S. citizens; and (5) the combination of the previous four factors warranted a reduction in her sentence.

Dyce had three sentencing hearings. At the first, on June 20, 1994, the district court expressed concern over separating Dyce from her children. The court dismissed the Government's suggestion that the children live with their father with the comment that "kids are always better off living with the mother." Transcript of 6/28/94 Sentencing Hearing at 11. The sentencing hearing was continued without objection from the Government because Dyce was seven months pregnant at the time.

At the resumed hearing in September 1994, the district court indicated its unwillingness to impose a sentence that would separate Dyce from her children, including her newborn. The court stated:

The problem you have with small children is nobody really can take care of these kids.

\*     \*     \*

What are our alternatives then? Take the kids away, put the kids in a foster home, a little baby like that? Can't do that.

\*     \*     \*

Well, I mean, we can't take this baby, this is ridiculous. Did you hear that? She's breast feeding the child. How can we take—we can't put her away. It's just impossible.

Transcript of 9/19/94 Sentencing Hearing at 7, 9, 14.

At the final hearing, on October 19, 1994, the court inquired whether Dyce was still breast-feeding her youngest child. When she replied that she was, the court stated: "Well, I can't take the youngster away from the mother at this stage." Transcript of 10/19/94 Sentencing Hearing at 12. The court then sentenced Dyce to five years of probation, with the condition that she serve two years in a residential treatment program, to be followed by one year in a community correctional facility or halfway house.

The court later issued an opinion setting forth the basis for its departure from the five years of imprisonment required by the Sentencing Guidelines. The court found that Dyce's case presented extraordinary family circumstances because

[t]he Defendant is a single mother with three children under the age of four years old, one of whom is three months old and is being breast fed by the Defendant. At this point in time, the infant is totally dependent on the Defendant for nourishment. While these family circumstances do not decrease the Defendant's culpability for her crime, these family circumstances nevertheless play a role in the Court's consideration on sentencing. Causing the needless suffering of young, innocent children does not promote the ends of justice.

*United States v. Dyce*, 874 F.Supp. 1, 1–2 (D.D.C.1994) ("Sentencing Opinion"). The court also stated that the totality of the circumstances supported a downward depar-

ture. These included Dyce's lack of a criminal record or history of substance abuse, her remorse, her full explanation of her role in the crime, the aberrational nature of her conduct, and her ability to contribute to society in a meaningful way. *Id.*

## II. Discussion

### A. Standard of Review

The Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 *et seq.*, 28 U.S.C. §§ 991–98 (1995), allows district courts to depart from the sentencing levels established by the Guidelines if

the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0, p.s.

The Commission has instructed district courts to "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes," and to consider a departure only when the court "finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm. . . ." U.S.S.G. Ch.1, Pt.A, intro. comment., at 4(b). As the Supreme Court has held, appellate review of sentencing departures is narrow in scope and entails two distinct inquiries:

First, was the sentence imposed either in violation of law or as a result of an incorrect application of the Guidelines? If so, a remand is required under [18 U.S.C.] § 3742(f)(1). If the court concludes that the departure is not the result of an error in interpreting the Guidelines, it should proceed to the second step: is the resulting sentence an unreasonably high or low departure from the relevant guideline range? If so, a remand is required under § 3742(f)(2).

*Williams v. United States*, 503 U.S. 193, 202, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992).

■ Anticipating *Williams,* we have treated the first step of the inquiry as consisting of two parts. *See United States v. Jones,* 948 F.2d 732, 736 (D.C.Cir.1991). First, we determine whether the district court's reasons for the departure are, as a matter of law, " 'of a kind or degree that may appropriately be relied upon to justify departure.' " *Id.* (quoting *United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir.1989)). Second, we determine whether the district court's factual findings are clearly erroneous. *Id.* Finally, we review the extent of a departure (step two of the *Williams* analysis) under a standard of reasonableness. *Id.*

B. Extraordinary Family Circumstances

■ Congress has directed the Sentencing Commission to "assure that the guidelines and policy statements ... reflect the general inappropriateness of considering the ... family ties and responsibilities ... of the defendant." 28 U.S.C. § 994(e). Pursuant to this statutory mandate, the Commission has provided that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6, p.s. The courts of appeals that have considered the issue unanimously agree that this section, by negative implication, permits departures when family circumstances are "extraordinary." *See United States v. Canoy,* 38 F.3d 893, 906 (7th Cir. 1994), and cases cited therein.

■ The issue, then, is what constitutes "extraordinary" family ties and responsibilities. At the risk of stating the obvious, we note that the "extraordinary" can be defined only in relation to the "ordinary"; and at the risk of belaboring the obvious, we add that ordinary family responsibilities can be very great. Nevertheless, while

> [i]t may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, ... at some point, the nature and magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the "ordinary" case of such circumstances into a case that is not at all ordinary.

*United States v. Rivera,* 994 F.2d 942, 948 (1st Cir.1993).

■ The issue is admittedly a murky one; nevertheless, we underscore what is implicit in the word "extraordinary" and explicit in the Guidelines themselves: departures on such a basis should be rare. Because the Commission considered family circumstances in formulating the Guidelines, even if only by following the congressional mandate to reflect the "general inappropriateness of considering ... family ties and responsibilities," 28 U.S.C. § 994(e), a court may depart on this basis only if the case *"significantly* differs from the norm." U.S.S.G. Ch.1, Pt.A, intro. comment., 4(b) (emphasis added).

We have never squarely addressed the proper standard of review applicable to a district court's departure from the Guidelines on the basis of "extraordinary" circumstances. The Government argues that *de novo* review is appropriate. We disagree. The question before us is not whether, as a matter of law, extraordinary family circumstances constitute grounds for departure; that question has already been answered in the affirmative. The question is whether, in the factual context of a particular case, extraordinary family circumstances exist. As then-Chief Judge Breyer observed in *Rivera,*

> [t]he district court's decision that circumstances are of a "kind," or "degree," that warrant departure will *not* involve a "quintessentially legal" interpretation of the words of a guideline, but rather will amount to a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent. A district court may well have a special competence in making this kind of determination, because it may have a better "feel" for the unique circumstances of the particular case before it.

994 F.2d at 951 (emphasis in original).

■ Accordingly, a district court's determination that extraordinary family circumstances exist will be entitled to considerable respect on appeal. *Id.* at 952; *Canoy,* 38 F.3d at 908; *see also United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991); *cf. United*

*States v. Kim,* 23 F.3d 513, 517 (D.C.Cir. 1994) ("due deference" will be given "to the district court's application of the guidelines to facts"). Here, however, the district court has offered no reasons for distinguishing the family situation in this particular case from that of the ordinary one in which a single mother is sentenced and jailed for a drug offense pursuant to the Guidelines. To the contrary, the record suggests that Dyce's incarceration would have less of an adverse effect on her family than would normally be expected in such cases. Therefore, we see no need to await the outcome of the Supreme Court's consideration of this precise standard of review question in *Koon v. United States,* — U.S. —, 116 S.Ct. 39, 132 L.Ed.2d 920 (1995) (granting *certiorari*).

■ In its Sentencing Opinion, the district court describes Dyce as "a single mother with three children under the age of four years old, one of whom is three months old and is being breast fed by the Defendant." 874 F.Supp. at 1–2. Earlier, at the second sentencing hearing, the court commented that Dyce's incarceration would require placing the children in a foster home. That last concern, however, has proven ill-founded. While it is true that Dyce is unmarried, she was not living alone. To the contrary, as the presentence report indicated and as the Government observed at the sentencing hearings, at the time of her arrest, Dyce was living not only with the father of her children but also with her parents and sister, who were employed. The probation officer was unable to confirm that Dyce herself had been gainfully employed during the six years preceding her arrest; there is thus no evidence in the record indicating that Dyce currently shoulders the financial burden of raising her children. The record also confirms that the children could and would be cared for by members of her family. Indeed, at the time of the final sentencing hearing, the eldest child was living with his father in Brooklyn, while the second child was living with Dyce's mother and sister in England.

In those cases that have approved departures based on extraordinary family responsibilities, defendants have made far more convincing showings of special hardships or needs than has Dyce. *See, e.g., United States v. Gaskill,* 991 F.2d 82 (3d Cir.1993) (defendant was the sole provider for his wife, who had been manic-depressive for 30 years and was unable to leave the house or take care of herself); *United States v. Peña,* 930 F.2d 1486, 1494–95 (10th Cir.1991) (defendant, a single mother, was steadily employed and was the source of support for an infant, a 16–year–old daughter, and the latter's infant).

The only factor that even arguably removes this case from the relevant heartland of cases is Dyce's breast-feeding of her youngest child. The Sentencing Opinion observed that the infant is "totally dependent on [Dyce] for nourishment." 874 F.Supp. at 2. It is clear from the record that this fact weighed heavily in the district court's decision.

■ As a preliminary matter, we note that Dyce's youngest child was conceived after her arrest. Courts are extremely reluctant to take pregnancy into consideration under such circumstances. *See United States v. Pozzy,* 902 F.2d 133, 139 (1st Cir. 1990) ("to allow a departure downward for pregnancy could set a precedent that would have dangerous consequences in the future, sending an obvious message to all female defendants that pregnancy is 'a way out' "). Furthermore, there is no evidence in the record supporting the district court's statement in its Sentencing Opinion that the infant was "totally dependent on [Dyce] for nourishment," nor is there any evidence that the child could not have been fed from a bottle. But even if the court wished to take into account the generally accepted advantages of breast-over bottle-feeding, it could have accommodated Dyce by giving her the option of delaying the commencement of her sentence until after her baby had been weaned.

In sum, we can find nothing to suggest that Dyce's family circumstances were in any degree "extraordinary." To the contrary, hers were demonstrably better than those of many defendants who have been denied departures for extraordinary family responsibilities. *See, e.g., United States v. Webb,* 49 F.3d 636, 638 (10th Cir.) (defendant was sole

caretaker and "loving and conscientious" parent of a son who had been on his school's honor roll before defendant's incarceration but had problems thereafter), *cert. denied*, —— U.S. ——, 116 S.Ct. 121, 133 L.Ed.2d 71 (1995); *United States v. Brown*, 29 F.3d 953, 961 (5th Cir.1994) (defendant had two children under the age of five with undefined medical problems who would have to live with great-grandmother); *United States v. (John) Goff*, 20 F.3d 918, 921 (8th Cir.1994) (defendant, whose wife was disabled by depression and panic attacks, provided sole support for three young sons); *United States v. Chestna*, 962 F.2d 103, 107 (1st Cir.1992) (defendant was single mother of four young children, one of whom was born after sentencing); *United States v. Cacho*, 951 F.2d 308, 310 (11th Cir.1992) (defendant was mother of four young children). As the Fourth Circuit observed in *United States v. Brand*, 907 F.2d 31, 33 (4th Cir.1990),

> [i]t is apparent that in many cases the other parent may be unable or unwilling to care for the children, and that the children will have to live with relatives, friends, or even in foster homes.... [Defendant's] situation, though unfortunate, is simply not out of the ordinary.

In Dyce's case, there is no evidence that her children will not receive adequate care.

The unfortunate fact is that some mothers are criminals; and, like it or not, incarceration is our criminal justice system's principal method of punishment. A term in jail will *always* separate a mother from her children. While we will give due deference to a district court's determination that the impact of that separation will be extraordinary, the record contradicts the district court's finding that such would be the case here. Dyce "has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts ... parental relationships...." *United States v. Daly*, 883 F.2d 313, 319 (4th Cir.1989).

## C. Totality of the Circumstances

The district court found that other factors supported a downward departure:

> In sentencing, the Court must take into account the totality of the circumstances. Other circumstances in this case support the Court departing downward from the sentence guidelines. The Defendant in this case has no prior criminal record and no history of substance abuse. The Court finds that she is remorseful and that she does not pose a threat to society. She fully explained her role in this case which was essentially a transporter of drugs from New York to a designation [sic] in North Carolina. The Defendant's conduct was aberrational in character and she is capable of contributing to society in a meaningful manner.

874 F.Supp. at 2.

Dyce argues that district courts may base a departure on a combination of factors even if no single factor would justify a departure. Dyce notes that effective November 1, 1994, the Sentencing Commission adopted commentary explicitly authorizing downward departures in "extremely rare" cases in which a combination of factors or circumstances "not ordinarily relevant to a departure" causes a case to "differ[ ] significantly from the 'heartland' cases ... even though none of the characteristics or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, comment. Because Dyce was sentenced before this commentary became effective and because the Sentencing Commission has not designated this provision as one to be applied retroactively, *see* section 1B1.10, it is not relevant to the sentence we here review. Nevertheless, even before the Sentencing Commission added this commentary, several circuits had held that district courts could base departures on combinations of factors. *See, e.g., United States v. Ziegler*, 39 F.3d 1058, 1063 (10th Cir.1994); *United States v. Cook*, 938 F.2d 149, 153 (9th Cir.1991). These cases did not hold, however, that district courts before November 1, 1994, could base departures on combinations of factors already considered by the Sentencing Commission. *See, e.g., United States v. (Cheryl) Goff*, 907 F.2d 1441 (4th Cir.1990). As demonstrated below, none of the factors cited by the district court can serve as a basis for departure either because they have already been considered by the Commission or be-

cause they are not properly invoked in this case. We thus cannot affirm Dyce's sentence based on the district court's "totality of the circumstances" analysis. At Dyce's resentencing, of course, the amended commentary to section 5K2.0 will be effective, *see* 18 U.S.C. § 3553(a)(5); but we express no view as to its meaning or relevance to Dyce's case.

### 1. No Prior Record/No Threat to Society

█ In reducing the sentence, the district court relied in part on Dyce's lack of a prior criminal record and on its conclusion that she did not pose a threat to society. It is clear from the Guidelines that the Commission took both of these factors into consideration when it made provision for first offenders:

> The lower limit of the range for Criminal History Category I *is set for a first offender with the lowest risk of recidivism.* Therefore, a departure below the lower limit of the guideline range for Criminal History Category I on the basis of the adequacy of criminal history cannot be appropriate.

U.S.S.G. § 4A1.3, p.s. (emphasis added). Thus, the Commission has expressly forbidden a further downward departure "even for defendants who may be unusually unlikely to commit crimes in the future." *United States v. Koon*, 34 F.3d 1416, 1457 (9th Cir.1994), *cert. granted*, —— U.S. ——, 116 S.Ct. 39, 132 L.Ed.2d 920 (1995).

### 2. Remorse/Full Explanation

█ The district court also cited Dyce's remorse and her "full explanation" of her role in the crime. The Government argues that the Commission considered both of these factors when it authorized a two-level decrease in the offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense...." U.S.S.G. § 3E1.1(a). Because Dyce was granted a two-level reduction pursuant to section 3E1.1(a), the Government correctly contends that a further reduction is prohibited for an acceptance of responsibility.

With respect to the factor of remorse, we note that that word is defined as "a gnawing distress arising from a sense of guilt for past wrongs." Webster's Ninth New Collegiate

Dictionary (1985). While "acceptance of responsibility" may be an essential component of "remorse," the latter is not a necessary element of the former. A person can accept responsibility for a crime ("yes, I killed my wife") without feeling remorse ("she had it coming"). In its commentary, however, the Commission made it clear that it contemplated a moral element to the section 3E1.1 reduction. *See* U.S.S.G. § 3E1.1 comment., (n.1) (in determining whether departure warranted, courts may consider, among other factors, the voluntary termination of criminal conduct, voluntary payment of restitution, voluntary surrender to the authorities, and post-offense rehabilitative efforts); *see also United States v. McKinney*, 15 F.3d 849, 853 (9th Cir.1994) ("[t]he primary goal of the [§ 3E1.1] reduction is to reward defendants who are genuinely contrite"), *cert. denied*, —— U.S. ——, 116 S.Ct. 162, 133 L.Ed.2d 105 (1995). We hold, therefore, that implicit in the phrase "acceptance of responsibility," as used in section 3E1.1(a), is an admission of moral wrongdoing. *See United States v. Brewer*, 899 F.2d 503, 509 (6th Cir.1990) ("the factor of ... remorse was considered under the guidelines"). Accordingly, an expression of remorse cannot provide an independent ground for departure beyond the two-level reduction Dyce already received.

Nor may Dyce's explanation of her role as a courier serve to justify a departure from the guideline sentence. In the first instance, her acceptance of responsibility, for which her offense level was reduced from 34 to 32, necessarily required an acknowledgment that she was guilty as charged. We see no basis for granting her an additional reduction merely because she volunteered the details of her involvement in the crime. Indeed, there is nothing in the record to suggest that Dyce took any action beyond what is normally encompassed in an acceptance of responsibility. If anything, the opposite is true. Dyce disavowed responsibility for any wrongdoing through two suppression hearings. In denying her motion to suppress, the district court stated that she had "not be[en] truthful about a number of the events to which she testified." *United States v. Dyce*, 842 F.Supp. 14,

**1470**

19 (D.D.C.1993). Dyce's full explanation of her role in the crime would not come until several months later, when she agreed to plead guilty.

Moreover, the Sentencing Guidelines make specific provision for a downward departure where a defendant supplies substantial assistance to the Government, but only where the Government certifies to the district court that the help received has been of sufficient value to warrant the departure. *See* U.S.S.G. § 5K1.1; *see also United States v. Jones,* 58 F.3d 688, 691 (D.C.Cir.) ("under section 5K1.1 ... a motion of the Government is a prerequisite to the exercise of judicial discretion to depart below the Guidelines range"), *cert. denied,* —— U.S. ——, 116 S.Ct. 430, 133 L.Ed.2d 346 (1995). In light of the above, it cannot be said that the Commission failed to take into account that a defendant, such as Dyce, might provide the details of her complicity in a crime.

### 3. *Aberrational Behavior*

■ In granting the departure, the district court also relied on its conclusion that Dyce's actions had been "aberrational." This finding would appear to be based on the facts that Dyce had never been convicted of a crime and had no history of substance abuse. In the introduction to the Guidelines, the Sentencing Commission states that it has "not dealt with ... single acts of aberrant behavior that still may justify probation at higher offense levels through departures." U.S.S.G. Ch.1, Pt.A, intro., comment., 4(d). Because the Commission has not considered such behavior, a district court may depart from the guideline sentence on a finding that the defendant had acted aberrationally.

■ Our sister circuits disagree as to the meaning of aberrant behavior. The Fifth and Seventh Circuits have concluded that such behavior "generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." *United States v. Carey,* 895 F.2d 318, 325 (7th Cir.1990); *United States v. Burleson,* 22 F.3d 93, 94 (5th Cir. 1994) (same). On the other hand, the Ninth Circuit would include within what it describes as an "aberrant behavior spectrum"

not only a single spontaneous act, but "a whole series of acts [that] lead up to the commission of [a] crime." *United States v. Takai,* 941 F.2d 738, 743 (9th Cir.1991).

We share the view of the Fifth and Seventh Circuits; the Ninth Circuit's approach would have the effect of converting any first crime into an aberration. In the present case, the district court offered no explanation for its conclusion that "[t]he Defendant's conduct was aberrational in character." *Dyce,* 874 F.Supp. at 2. We thus have no way of knowing whether the district court would have granted a departure under the interpretation of "single acts of aberrant behavior" that we adopt today. There is certainly evidence in the record suggesting that Dyce's behavior would not meet this definition. For example, her train reservation to North Carolina for the purpose of carrying drugs was made two days before she boarded, which would appear to have given her ample opportunity to reconsider her decision to transport drugs. Nevertheless, we do not decide this question in the first instance, but leave it for the district court to consider in its discretion, but consistent with this opinion, on remand.

### 4. *Contribution to Society*

■ Like family responsibilities, a defendant's education, employment record, and various good works are "not ordinarily relevant" in determining departures. U.S.S.G. § 5H1.2, p.s., § 5H1.5, p.s., and § 5H1.11, p.s. These factors may be said to be indicia of a person's capacity to contribute to society. Before a district court departs on this basis, it must not only find that the defendant is likely to make such contributions, but that he is likely to make them to an extraordinary degree. *See United States v. Reilly,* 33 F.3d 1396, 1424 (3d Cir.1994).

■ In the present case, the district court found that Dyce was "capable of contributing to society in a meaningful manner." 874 F.Supp. at 2. We have searched the record for any factual basis for this finding but have found none. The writer of the presentence report was unable to verify Dyce's claims of recent employment; nor could he confirm that she had been graduat-

ed from high school. Furthermore, the record contains nothing to suggest that Dyce would be likely to use her talents for the benefit of others. Defendants who have made convincing showings of their utility to society have been denied departures on this basis. *See, e.g., Ziegler,* 39 F.3d at 1062 ("While [the defendant's] background and personal achievements are certainly praiseworthy, . . . they nevertheless do not warrant a departure from the guideline sentencing range."); *United States v. Desormeaux,* 952 F.2d 182, 185 (8th Cir.1991) ("While [the defendant] is to be commended on her successful efforts in advancing her education, her post-arrest achievement is not sufficiently extraordinary to warrant a downward departure."). Although we share the district court's hope that Dyce will contribute meaningfully to society upon completing her sentence, hope alone cannot justify a departure.

D. Factors Not Relied on by the District Court

Dyce argues in favor of the downward departure for two reasons not mentioned by the district court in its Sentencing Opinion. She maintains that her status as a deportable alien may subject her to more severe prison conditions than an otherwise similarly situated U.S. citizen and that the disparity in the offense levels accorded crimes involving crack cocaine and cocaine powder discriminates against black defendants. Dyce presented both of these arguments to the district court, but the court did not rely on them in explaining its downward departure.

We need not consider Dyce's arguments for a departure based on either her alien status or the Guidelines' alleged discriminatory effects on black defendants. As the Supreme Court explained in *Williams v. United States,* 503 U.S. 193, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992), "once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.,* that the error did not affect the district court's selection of the sentence imposed." *Id.* at 203, 112 S.Ct. at 1120 (citing Fed.R.Crim.P. 52(a)). We have

rejected all of the grounds on which the district court relied in departing downward; and, given the district court's failure even to mention Dyce's final two arguments, we cannot conclude "that the district court would have imposed the same sentence absent the erroneous factor[s]." *Id.* at 203, 112 S.Ct. at 1121. We thus remand without addressing Dyce's final two arguments.

III. Conclusion

In determining whether "extraordinary" family circumstances exist in a particular case, a district court should focus on the effects of a defendant's sentence on innocent third parties. In the present case, Dyce's family in fact took care of her older children; and she offered no evidence that care will be unavailable for the infant. Thus, the district court's finding of extraordinary circumstances has no basis in the record. Finally, none of the other factors cited by the court remove this case from the relevant "heartland" that the Commission had taken into account in fashioning the Guidelines. Accordingly, the sentence of Amrhu Dyce is vacated and the case remanded for resentencing consistent with this opinion.

*So ordered.*

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS and TATEL, Circuit Judges.

ON APPELLEE'S SUGGESTION FOR REHEARING *IN BANC*

*O R D E R*

PER CURIAM.

Appellee's Suggestion For Rehearing *In Banc* and the response thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is

**ORDERED** that the suggestion be denied.

A statement by Circuit Judge TATEL concurring in the denial of rehearing and rehearing *en banc* is attached.

A statement by Circuit Judge WALD dissenting from the denial of rehearing *in banc* is attached.

TATEL, Circuit Judge, *concurring in denial of rehearing and rehearing en banc:*

Under the Sentencing Guidelines, district judges have discretion to depart downward in response to the extraordinary family circumstances of defendants, but they must do so based on careful fact-finding and reasoned decisionmaking. The Supreme Court has now made clear that we review such departures for abuse of discretion. *See Koon v. United States,* —— U.S. ——, ——–——, 116 S.Ct. 2035, 2044–45, 135 L.Ed.2d 392 (1996). The panel's decision regarding the district court's treatment of family circumstances is consistent with this command. Because the district court's conclusions were unsupported by record evidence, there was an abuse of discretion. Indeed, the district court made inaccurate assumptions about parental responsibility under New York law and made generalizations such as, "[T]he kids are always better off living with the mother," and "[N]ormally speaking, they are better-kept children with the mother." The district court also made conclusory statements about appellee's family situation, such as, "[I]f the father has to take care of the kids, then he isn't going to be able to go out and earn money for the kids." Not only does no record evidence support this assertion, but the weight of the evidence suggests it is untrue: Appellee, her children, and their father lived at the time of her arrest with three other adult relatives. Although, as Judge Wald points out, the record does not reflect any arrangement for the care of the infant, that is because the district court chose not to explore this issue, and appellee presented no evidence showing that her infant—or her other children, for that matter—would not receive adequate care were she to be sent to prison.

This case does not present the general question whether convicted parents should be sent to prison. That is a question for Congress. The issue here is whether the district court in this case made the findings necessary to justify departing downward from the sentencing range prescribed by the Sentencing Guidelines. Because the district court failed to base its decision on record evidence, and because the modifications the panel has made in its opinion leave the district court free to take additional evidence, this case is inappropriate both for rehearing and for rehearing *en banc.*

WALD, Circuit Judge, dissenting from the denial of rehearing *in banc.*

I would grant the petition for rehearing *in banc.* The district court granted Amhru Dyce, a first offender drug courier ("mule"), a downward departure under, *inter alia,* § 5H1.6 of the Sentencing Guidelines, on the basis of her obligations to her two young children and infant. Instead of the Guidelines-prescribed five years imprisonment, the court sentenced appellant to five years of probation, two of which were to be served in a residential treatment program, followed by one year in a community correctional facility or halfway house. The panel disallowed the departure, finding "nothing to suggest that Dyce's family circumstances were in any degree 'extraordinary,'" *United States v. Dyce,* 78 F.3d at 610 (D.C.Cir.1996) [hereinafter "78 F.3d"], and it now reaffirms that decision in denying her petition for rehearing.

Section 5H1.6 of the Sentencing Guidelines, which provides that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," U.S.S.G. § 5H1.6, p.s., has been interpreted by various courts of appeals as permitting a downward departure only when a defendant presents "extraordinary" family circumstances. The question of when family obligations rise to this level is an issue affecting tens of thousands of federal offenders and their families. More than half of all female prisoners and more than one-quarter of all male prisoners are caring for minor children at the time they enter prison. *See* Stephen J. Schulhofer, *The Feminist Challenge in Criminal Law,* 143 U. PA. L.REV. 2151, 2190 n.155 (1995) (citing BUREAU OF

JUSTICE STATISTICS, WOMEN IN PRISON 6 (1991)). Other prisoners have primary responsibility for the care of parents, siblings, spouses, or grandchildren. In these cases, the impact of imprisonment on a defendant's family is profound; it imposes not just financial and emotional hardship, but in some cases, loss of children to foster care or even complete severance of parental rights. Many Guidelines commentators, with whom I agree, conclude that in light of the significant detriment experienced by children as a result of a parent's incarceration, the Commission's initial presumption against considering family ties is unwarranted, short-sighted, and unwise.[1] Nonetheless, in this context, I acknowledge that the Guidelines presumptions, "warts and all," govern our sentencing review. But how the trial and appellate courts apply § 5H1.6 to the varied family scenarios that come before them is still the subject of legitimate dialogue and solicitude among judges. That is the reason I would rehear this case *in banc*: to lay down for the circuit some standards and guidance in this difficult and wrenching area of the law.

As the panel admits, the question of what constitutes "extraordinary" circumstances justifying a departure from the Guidelines for family responsibilities "is admittedly a murky one." 78 F.3d at 615. In reviewing § 5H1.6 departures, courts are asked (mistakenly, I believe) to undertake a "mission impossible" of identifying where the ephem-

eral line between "ordinary" and "extraordinary" lies in the tragic realm of family breakup and disruption of children's lives.[2] Obviously no bright-line rule is reasonable, or even feasible—for example, "single parent with two or more children and dependent parent," or "single parent with young child and infant"; the variety of family structures, attachments, personalities, and track records in fulfilling responsibilities defies any such easy categorization. As a result, in order to accommodate competing needs for discretion and guidance, courts of appeals have in the main employed two strategies: granting significant deference to a district court's decision of whether departure is warranted, and delineating some boundaries on the sentencing court's authority to grant a departure. Regrettably, in my view at least, the panel opinion goes far enough afield from both goals to warrant rehearing by the full court.

On the deference front, the panel opinion itself acknowledges that "a district court's determination that extraordinary family circumstances exist will be entitled to considerable respect on appeal." 78 F.3d at 615 (citing cases). That is necessarily so because this decision

> will amount to a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent. A district court may well have a special competence in making

1. For an assessment of the Commission's stance on this issue, see, e.g., Phyllis J. Newton, et al., *Gender, Individuality, and the Federal Sentencing Guidelines*, 8 FED. SENT. REP. 148, 151 (1995) (citing, *inter alia*, Eleanor Bush, *Not Ordinarily Relevant? Considering the Defendant's Children at Sentencing*, 54 FED. PROBATION 15 (1990); Susan E. Ellingstat, *Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities*, 76 MINN. L.REV. 981 (1992)). It is well acknowledged that this facially neutral provision has a disparate impact on female offenders, who are far more likely than their male counterparts to be the sole caregivers of minor children at the time of incarceration. *See, e.g.,* Julian Abele Cook, Jr., *Gender and Sentencing: Family Responsibility and Dependent Relationship Factors*, 8 FED. SENT. REP. 145, 145–46 (1995); John C. Coughenour, *Separate and Unequal: Women in the Federal Criminal Justice System*, 8 FED. SENT. REP. 142, 143 (1995); Kathleen Daly, *Gender and Sentencing: What We Know and Don't Know From Empirical Research*, 8 FED.

SENT. REP. 163, 166–67 (1995); Myrna S. Raeder, *Gender and Sentencing: Single Moms, Battered Women, and Other Sex–Based Anomalies in the Gender–Free World of the Federal Sentencing Guidelines*, 20 PEPP. L.REV. 905 (1993); Schulhofer, *The Feminist Challenge in Criminal Law*, at 2189 (10.5% of female inmates, as compared with 1.7% of male inmates, have children who are assigned to foster care or an institutional placement during parent's incarceration).

2. As then-Chief Judge Breyer explained, "It may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, but, at some point, the nature and magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary." *United States v. Rivera*, 994 F.2d 942, 948 (1st Cir.1993).

this kind of determination, because it may have a better 'feel' for the unique circumstances of the particular case before it. *United States v. Rivera,* 994 F.2d 942, 951 (1st Cir.1993). Just last month, the Supreme Court validated this approach in *Koon v. United States,* directing appellate courts to review all departures granted by district courts only for an abuse of discretion:

> [T]he text of [the statutory provision governing appellate review of Guidelines sentences] manifests an intent that district courts retain much of their traditional sentencing discretion.... A district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court.... [T]he district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

*Koon v. United States,* —— U.S. ——, —— – ——, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996) (citations omitted). Here, I think the panel unduly encroaches upon the sentencing court's discretion in redrawing the ordinary/extraordinary cut, and indeed in doing so, may have gotten some of the underlying facts of the case wrong.

The panel reversed the district court's grant of a downward departure in part be-

cause it found the sentencing judge's concern for the welfare of Amhru Dyce's three children to be "ill-founded." 78 F.3d at 616. Dyce, as the district court and panel both noted, is a single mother with three children. At the time the sentence was imposed in October of 1994, one of the children was three years old, one thirteen months, and the youngest only three months old. Sent. Order at 2, *reprinted in* App. D; Sent. Hr'g of June 20, 1994, at 3, 15, *reprinted in* App. F. During the course of the sentencing hearings, the district court repeatedly stated that if Dyce were incarcerated, she could not breast feed her youngest child. *See* Sent. Order at 2; Sent. Hr'g of Sept. 19, 1994 at 14, *reprinted in* App. G; Sent. Hr'g of Oct. 19, 1994, at 12, *reprinted in* App. H. The judge also expressed concern that all three children would receive inadequate care, perhaps even be sent to foster care. *See* Sent. Hr'g of June 20, 1994, at 4–14; Sent. Hr'g of Sept. 19, 1994, at 7, 9, 11. These considerations led the court to conclude that "extraordinary family circumstances are presented," Sent. Order at 1–2, which in combination with several other grounds[3] warranted a downward departure. The panel, however, disagreed with that assessment of Dyce's circumstances, stating that "[t]he record ... confirms that the children could and would be cared for by members of her family." 78 F.3d at 616.

The panel's assertion, however, is not so credibly rooted in the record. Although the government claimed at oral argument that Dyce's family could assume responsibility for all three children, Dyce's counsel disputed that statement. The record does indicate that at the time of the final sentencing hearing in October 1994, Dyce's three-year-old son was living with his father, and her thirteen-month-old daughter had been sent abroad to live with Dyce's mother and sister. *Id.*; *see also* Sent. Hr'g of Oct. 19, 1994, at 4. No alternative care, however, had been identified for the three-month-old infant.[4] In-

---

3. The district court stated that its departure was based on a totality of circumstances: Dyce's extraordinary family circumstances, her lack of a criminal record or substance abuse history, her remorse and acceptance of responsibility, the aberrational nature of her conduct, and her abili-

ty to contribute to society. *See* Sent. Order at 2; 78 F.3d at 613.

4. In the petition for rehearing, appellee addresses this issue as follows:

deed, the reason the district court gave for its decision to sentence Dyce to a residential treatment facility for two years was so that the infant could remain with Dyce while she served her time. Sent. Hr'g of Oct. 19, 1994, at 4, 12–14 ("[S]he should be with her baby.... I am going to sentence her to incarceration for 36 months to be as follows. I'm going to place her in this [residential] program for the first 24 months. Thereafter for 12 months, I'm going to place her in a community correction facility. Hopefully by the end of that first 24 months, the child will be in a situation that can be taken care of by the father."). Thus it could be said that the panel not only invaded the district court's discretion as to its overall assessment of Dyce's family responsibilities, but it misread the record in the process since there was not firm evidence that Dyce's family would, in fact, care for all three of appellant's children[5]—an error I believe serious enough to warrant revisiting the panel's reversal. The panel concluded that "[t]he unfortunate fact is that some mothers are criminals; and, like it or not, incarceration is our criminal justice system's principal method of punishment.... While we will give due deference to a district court's determination that the impact of that separation will be extraordinary, the record contradicts that district court's finding that such would be the case here." 78 F.3d at 617. The awful truth is that not only have two young children been denied any real opportunity to see their mother on a regular basis during their most formative years, but the baby may have fallen through the cracks altogether. Talmudic distinctions between ordinary and extraordinary suffering aside,

this is a strange kind of jurisprudence for a family-oriented society. The panel's conclusion, even if factually correct, is based entirely on a notion that so long as the extended family can provide economic care and physical custody, no further inquiry is necessary as to the import of separating the siblings from each other, as well as from their mother, without realistic possibility of even visitation. Even the constraining effect of the Guidelines does not prohibit consideration of these factors—all of which are central, I think, to a nuanced determination of whether family circumstances qualify as "extraordinary" or not.

In denying Dyce's petition for rehearing, the panel now appears to soften its stance somewhat by declaring that while appellant's family circumstances may not preclude a departure as a matter of law, the departure must be reversed because the district court did not make sufficient factual findings in support of its decision. *See* Amended Op., at 1471 ("In the present case, Dyce's family in fact took care of her older children; and she offered no evidence that care will be unavailable for the infant. Thus, the district court's finding of extraordinary circumstances has no basis in the record."); Statement of Tatel, J., *concurring in denial of rehearing and rehearing en banc,* at 1 ("the district court's conclusions were unsupported by record evidence"). While I find the panel's revised position an improvement over the initial opinion, I read *Koon* as cautioning us not to scrutinize a sentencing judge's factfinding in this highly discretionary area in an unduly intrusive manner. Although the district court's exploration of Dyce's circumstances

---

The panel also states that the "record confirms that the children could and would be cared for by members of her family." There was no indication, however, that this could be done if a five-year imprisonment sentence was imposed, especially with respect to the infant. Appellee's Pet. for Reh'g and Suggestion for Reh'g *In Banc* at 4. In addition, at oral argument, counsel for appellee stated that

Of course, there's no indication of who could have cared for the infant, whether any of them were capable of caring for the infant at all ... bottle feeding on a daily basis, even converting from the breast-feeding to the bottle feeding.

5. It is not even clear that Dyce's family or the father of her children was caring for the oldest

child at the time of oral argument. In an exchange at oral argument regarding the residential treatment facility where Dyce had been sent, counsel for appellee informed the court that "[Dyce's] son was able to join her as well. He was having some problems at home, so he's been with her for the past four months as well in this project." Counsel does not explain whether the "son" he refers to here is the oldest child or the infant. Since the infant was scheduled to have remained with his mother for the duration of her stay at this facility, I presume that the son who "joined her" was the oldest—indicating that Dyce's family was *not* able to care for this child, either, in her absence.

during the sentencing hearings may have been less than meticulous and did include several references to the alleged advantages of maternal childcare (statements which, taken alone, would not warrant a departure), the record shows that the judge saw appellant on at least four separate occasions and engaged in repeated conversations with counsel for appellant and the government over the placement of the three children. Implicit in all of these exchanges was the assumption that neither Dyce's family members nor the children's father could care for the infant.[6] The district court judge could perhaps be faulted for his failure to expressly ask the appellant, "Can anyone in your family care for your infant child if you are incarcerated?" or even more specifically, "Your mother and sister, residing in England, appear willing to care for your older daughter. Would they care for your infant? What about the baby's father? He appears willing to care for the oldest child. Will he care for the infant, also?" Admittedly, such questions might have provided a fuller picture of what might befall appellant's children if their mother were to be incarcerated for five years. But based on the uncontradicted information available to it, the district court clearly felt comfortable in concluding that

Dyce had demonstrated the necessary degree of extraordinary circumstances to warrant a departure.[7] In light of the Court's recent instruction to recognize the "institutional advantage" of a district court in separating "ordinary" circumstances from "extraordinary," I would give considerably more leeway than does the panel to the district court's judgment on this point.

In addition to ensuring that our review of sentencing decisions does not trample the discretion accorded sentencing judges, I believe rehearing *in banc* is also merited to define for the district court some comprehensible parameters for departure under § 5H1.6. The cumulation of rulings by our sister circuits provides only suggestions, not a great deal of firm guidance. Nor do I think our trial judges can take much guidance from the panel opinion in this case. Several circuits have refused to sanction departures simply because incarceration will jeopardize the parental ties of a young child, where a relative is available to care for the children during the parent's incarceration. *See, e.g., United States v. Carr,* 932 F.2d 67, 72 (1st Cir.1991) (no departure for co-defendant parents with 4–year–old son; grandmother will care for child); *United States v.*

---

**6.** At the first sentencing hearing, on June 20, 1994, the district court judge stated that his "aim here is to keep [appellant] with the kids," Sent. Hr'g of June 20, 1994, at 14, and suggested that she be permitted to serve her time in a facility where she could remain with her children, *id.* at 5. The government replied only that it did not have a position to take on behalf of the government, although later in the hearing counsel stated that he thought appellant's children might be better off living with their father (without discussing whether the father would or could care for the child)—the one occasion on which anyone present at the proceedings ever challenged the assumption that Dyce was the only available caregiver for her infant child. *Id.* at 5, 10–11. At the second hearing, the district court judge, noting that there were "three kids that have got to be taken care of," Sent. Hr'g of Sept. 19, 1994, at 6, inquired at length as to various options which might permit appellant to remain with her children, even suggesting that she might be deported instead of incarcerated. He expressed particular concern about the infant: "The problem you have with small children is nobody really can take care of these kids.... What are our alternatives then? Take the kids away, put the kids in a foster home, a little baby

like that? Can't do that.... There's got to be something here, some kind of program that allows the mother to take care of the kids until they are at least able to fend for themselves." *Id.* at 7, 9, 14. When the judge indicated his willingness at the final hearing to sentence appellant to a residential treatment facility, the government's primary objection was that the program identified by appellant's counsel was designed for drug treatment—and Dyce did not have a substance abuse problem. *See* Sent. Hr'g of Oct. 19, 1994, at 7.

**7.** In its sentencing order, the district court found that

> The Defendant is a single mother with three children under the age of four years old, one of whom is three months old and is being breast fed by the Defendant. At this point in time, the infant is totally dependent on the Defendant for nourishment. While these family circumstances do not decrease the Defendant's culpability for her crime, these family circumstances nevertheless play a role in the Court's consideration on sentencing. Causing the needless suffering of young, innocent children does not promote the ends of justice.

Sent. Order at 2.

*Pozzy*, 902 F.2d 133, 139 (1st Cir.1990) (no departure for pregnant defendant whose sister has offered to care for child); *United States v. Brand*, 907 F.2d 31, 32–33 (4th Cir.1990) (no departure even though defendant is sole custodial parent of two young children; defendant's foster parents and mother-in-law will care for children during incarceration); *United States v. Brown*, 29 F.3d 953, 961 (5th Cir.1994) (no departure for defendant with two children under age five who are being cared for by great-grandmother). But other circuits have affirmed departures in circumstances markedly less compelling than this defendant's. The First Circuit—though denying departures in several earlier cases cited by the panel involving dependent minor children—did permit a departure based on a showing of a strong relationship between a defendant and his lover's son, even though the child's mother had custody of her son. *See United States v. Sclamo*, 997 F.2d 970 (1st Cir.1993). In other cases, departures have been authorized on the grounds that the defendant has several young children, in many cases without discussion of whether other relatives can or will care for the children. *See, e.g., Rivera*, 994 F.2d at 952–54 (three children under six); *United States v. Johnson*, 964 F.2d 124, 128–30 (2d Cir.1992) (departure affirmed for defendant who provided sole support for three young children and infant); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) (two children, living with disabled, dependent father and grandmother; no indication that defendant's spouse cannot fulfill family responsibilities); *United States v. Deigert*, 916 F.2d 916, 918–19 (4th Cir.1990) (departure authorized on grounds that, *inter alia,* defendant was mother of several children and pregnant with another); *United States v. Peña*, 930 F.2d 1486, 1494–95 (10th Cir.1991) (single parent of infant and sole support of 16–year–old daughter and her infant). One circuit left open the possibility that a departure would be permissible based solely on defendant's role as a "good father" to "three exemplary children." *United States v. Canoy*, 38 F.3d 893, 907–08 (7th Cir.1994). Another circuit affirmed departures in two cases based on the "unusual mitigating circumstances of life on an Indian reservation."

*United States v. One Star*, 9 F.3d 60, 61 (8th Cir.1993); *United States v. Big Crow*, 898 F.2d 1326, 1330–32 (8th Cir.1990). Departure has also been authorized based on a father's anguish at involving his son in a criminal enterprise, absent any showing that his incarceration would cause the family unit to disintegrate. *United States v. Monaco*, 23 F.3d 793, 800–02 (3d Cir.1994).

The precedent is admittedly conflicting, perhaps because the task assigned by the Guidelines is so frustrating and counterintuitive—that is, where on the spectrum we should draw the line between "ordinary" and "extraordinary" family tragedies? But the fact remains that our trial judges must wrestle with the problem every day. It is for many of them the most agonizing part of the Guidelines they must work with, and we as a reviewing court owe them the benefit of our best efforts to define parameters under which they can strive to sentence fairly with the welfare of children as well as society in mind. The panel, after overruling the trial court's best judgment here, has provided only a barebones, largely conclusory justification for its reversal. It states laconically that "[i]n those cases that have approved departures based on extraordinary family responsibilities, defendants have made far more convincing showings of special hardships or needs than has Dyce." 78 F.3d at 616; *see also id.* at 616 ("her [family circumstances] were demonstrably better than those of many defendants who have been denied departures"). It dismisses appellant's breast-feeding status as easily accommodated by a delay in her incarceration. The single clue it offers as to why Dyce's circumstances do not rise to the "extraordinary" level is that her children (according to the panel, but not the record below) will "receive[ ] the willing care of relatives" who are employed and thus presumed able to provide financial support for the children. 78 F.3d at 616, 617. We know nothing of who would actually take physical care of the children during the day (or night); it is apparently irrelevant that the children will be separated from one another as well as from their mother. If the panel is saying that any showing of relative's care (even if well-founded) renders a defendant ineligible for a § 5H1.6 departure, I think

that cutoff mark excessively rigid and more restrictive than that employed by many other circuits. If it is saying this is an area where individualized facts are paramount, I fail to see why the trial court's discretion should not prevail—at least in a case of three children under the age of 5 and a first-time, low-level drug offender ("mule") parent. If it is saying that the district court must run through any potential source of alternative care imaginable before concluding that incarceration would jeopardize the welfare of a defendant's children, I find that rule overly intrusive. If it is saying something else definitive, I cannot find it. In any event, I believe we are obliged to explain in more detail *what* criteria the district courts should henceforth rely upon in assessing requests for family responsibility departures, and in this particular case, we certainly should evaluate appellant's request on the basis of an accurate reading of the record below. Accordingly, I would hear the case *in banc*.